**ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS, INC., an Indiana not-for-profit corporation; American Council for Health Care Reform, a Virginia not-for-profit corporation; National Legal & Policy Center, a District of Columbia not-for-profit corporation, Appellees,**

v.

**Hillary Rodham CLINTON, wife of the President of the United States; Donna E. Shalala, Secretary of the Department of Health & Human Services, et al., Appellants.**

**Association of American Physicians and Surgeons, Inc., an Indiana not-for-profit corporation; American Council for Health Care Reform, a Virginia not-for-profit corporation; National Legal & Policy Center, a District of Columbia not-for-profit corporation, Appellees,**

v.

**Hillary Rodham Clinton, wife of the President of the United States, et al.**

**Ira C. Magaziner, White House Advisor, Appellant.**

Nos. 98–5048, 98–5049.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 12, 1998.

Decided Aug. 24, 1999.

Jacob M. Lewis, Attorney, United States Department of Justice, argued the cause for appellants Hillary Rodham Clinton, et al. Frank W. Hunger, Assistant Attorney General, and William Kanter and Michael S. Raab, Attorneys, United States Department of Justice, were on brief.

Irvin B. Nathan, James L. Cooper and Nancy L. Perkins were on brief for appellant, Ira C. Magaziner.

Thomas R. Spencer argued the cause for the appellees. Robert C. Gill was on brief.

Before: GINSBURG and HENDERSON, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the court filed PER CURIAM.

PER CURIAM:

The appellants, officials of the Executive Branch of the United States Government, including presidential advisor Ira C. Magaziner, (collectively referred to as the government) challenge the district court's December 22, 1997 award of attorney's fees to the appellees, Association of American

Physicians and Surgeons, American Council for Health Care Reform and National Legal & Policy Center, (collectively referred to as AAPS). The court awarded fees under the common law on the ground that the government litigated in bad faith and under the Equal Access to Justice Act, 28 U.S.C. § 2412, (EAJA) on the ground that the government's litigating position was not "substantially justified." Because we conclude the district court's bad faith findings are clearly erroneous, we reverse the fee award and remand for further consideration.

## I.

AAPS filed this action on February 24, 1993 alleging that the government violated the Federal Advisory Committee Act, 5 U.S.C. app. II, §§ 1–15, (FACA) by failing to file an advisory committee charter for the "President's Task Force on National Health Care Reform" (Task Force) and by denying access to meetings of both the Task Force and an "interdepartmental working group" overseen by Task Force member Magaziner. On March 3, 1993, in opposition to AAPS's motion for preliminary injunction, the government filed a declaration by Magaziner (Magaziner Declaration, Declaration) which averred, *inter alia*, that "[o]nly federal government employees serve as members of the interdepartmental working group." Joint Appendix (JA) 135. The Declaration explained that membership included approximately 300 "full-time, permanent employees, who work for the Executive office of the President, for federal agencies, for members of Congress or for Senate or House committees," and 40 "special government employees" who "have been employed by an agency or the Executive Office of the President for less than 130 days in a 365–day period, either with or without compensation." JA 135–37. In addition, the Declaration noted that the working group had "retained a wide range of consultants, who attend working group meetings on an intermit-

tent basis, either with or without compensation." JA 137.

On March 10, 1993 the district court issued a memorandum opinion and order granting AAPS's preliminary injunction motion. *AAPS v. Clinton*, 813 F.Supp. 82 (D.D.C.1993). The court held that the Task Force was an advisory committee and that it did not come within FACA's exemption for a "committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government," 5 U.S.C. app. II, § 3(2)(iii), because First Lady Hillary Clinton, who chaired the Task Force, was not a federal employee. The court also concluded, however, that the working group was not a FACA committee because it worked on behalf of the Task Force and did not directly advise the President. *See* 813 F.Supp. at 88–89 (finding interdepartmental working group (1) "directly compares" to task forces found exempt from FACA in *National Anti–Hunger Coalition v. Executive Committee*, 557 F.Supp. 524 (D.D.C.), *aff'd*, 711 F.2d 1071 (D.C.Cir. 1983), because it performed purely "staff" functions and (2) "fully meets" regulatory exemption from FACA in 41 C.F.R. § 101–6.1004(k), which "exclude[s] from the Act's coverage '[m]eetings of two or more advisory committee or subcommittee members convened solely to gather information or conduct research for a chartered advisory committee, to analyze relevant issues and facts, or to draft proposed position papers for deliberation by the advisory committee or a subcommittee of the advisory committee' ").

On appeal this court reversed and remanded, concluding (1) "[t]he question whether the President's spouse is 'a full-time officer or employee' of the government is close enough for us properly to construe FACA not to apply to the Task Force merely because Mrs. Clinton is a member," *AAPS v. Clinton*, 997 F.2d 898, 910–11 (D.C.Cir.1993), (*AAPS I*) and (2) the record was insufficiently developed to determine whether all of the working

group's members were full-time federal employees or whether the working group was sufficiently structured so as to constitute a committee under FACA, *id.* at 915. The court explained:

> When we examine a particular group or committee to determine whether FACA applies, we must bear in mind that a range of variations exist in terms of the purpose, structure, and personnel of the group. Perhaps it is best characterized as a continuum. At one end one can visualize a formal group of a limited number of private citizens who are brought together to give publicized advice as a group. That model would seem covered by the statute regardless of other fortuities such as whether the members are called "consultants." At the other end of the continuum is an unstructured arrangement in which the government seeks advice from what is only a collection of individuals who do not significantly interact with each other. That model, we think, does not trigger FACA.

*Id.* at 915.[1] While the working group "seem[ed] more like a horde than a committee," this court also noted that it had been created "with a good deal of formality and [is] perhaps better understood as a number of advisory committees." *Id.* at 914.

Taking its cue from this court's language in *AAPS I*, the government, in its first submission to the district court following remand, adopted what came to be known as the "wandering horde" theory of the case. Accordingly, the government proposed that discovery be limited to whether the working group's "structure, personnel and purpose" were such that it was a FACA committee, regardless whether it fell within the full-time employee exemption. The discovery that followed was con-

tentious and, in response to a motion to compel that AAPS filed, the district court set out what it viewed as the issues before it. The first issue was whether the "formality and structure of the working group ... [was such that] there are advisory committees within the working group, even if the working group itself is not an advisory committee." *AAPS v. Clinton,* 837 F.Supp. 454, 456 (D.D.C.1993). Although, as we note below, the government had not argued that the working group was exempt from FACA because it was composed only of full-time government employees, the other issues the district court thought relevant to discovery involved the "truth of the government's claim that all members of the working groups are full-time officers or employees of the government." *Id.* The district court then issued an order (dated November 9, 1993) granting the motion to compel and holding AAPS entitled to sanctions against the government under Fed.R.Civ.P. 37, although no sanctions were ever assessed.

On April 11, 1994 AAPS filed a summary judgment motion accompanied by a list of individuals who it claimed were members of the working group but who did not meet the requirements of FACA's federal employee exemption. The government filed a cross-motion for summary judgment on May 4, 1994 and argued that the working group was not a FACA "committee" because it lacked "'an organized structure, a fixed membership, and a specific purpose'" and was not operated "with 'formality.'" Cross–Motion Memorandum at 2 (quoting *AAPS I,* 997 F.2d at 914). In addition, the government stated in a footnote:

> Defendants do *not* argue here that the interdepartmental working group qualified for the FACA's exemption for

---

1. The *AAPS I* court rejected the district court's determination that the working group was not a FACA committee because its members acted merely as advisory staff to the Task Force and did not directly advise the President. The court reasoned that because the

Task Force was not itself a FACA Committee, the working group was "the point of contact between the public and the government" and could therefore not be exempt from FACA based on its subsidiary relationship to the Task Force. *AAPS I,* 997 F.2d at 912–13.

groups comprised wholly of full-time federal employees. As defendants have stated, the "members" of the working group were either regular employees of the Executive Branch or Congress or special government employees. In light of the Court of Appeals' discussion of the term "full-time," *see AAPS I,* 997 F.2d at 914–15, however, it would be a substantial burden for defendants and this Court to make a person-by-person assessment that each such "member" worked "full-time." Because it is clear that the interdepartmental working group and its working groups lacked the features of FACA committees identified by the court, it is not necessary for the defendants to attempt to prove the applicability of the FACA's exemption in any event.

*Id.* at 901, n. 1 (emphasis added).

On May 16, 1994 AAPS moved to hold Magaziner in contempt for having "made false and misleading statements under penalty of perjury in his March 3, 1993 Declaration," 5/16/94 Memorandum in Support of Motion for Sanctions and Rule for Contempt at 20, and for sanctions against the government for "defending the case by asserting facts they knew not to be true" (namely "that only full-time employees of the federal government … were participants on the Task Force working groups"), *id.* at 18, 16, and for having "constantly refused to comply with Plaintiff's discovery requests and [the district court's] November 9, 1993 Order compelling discovery," *id* at 18.

At a hearing on July 25, 1994 the district court denied the cross-motions for summary judgment and reserved ruling on the contempt and sanctions motion. *See* JA 832–33. Thereafter the government made the then defunct working group's documents available for inspection and as a consequence on December 21, 1994 the

district court issued an order declaring the merits, and the matter of civil contempt, moot. *AAPS v. Clinton,* 879 F.Supp. 106 (D.D.C.1994). In the same order the court referred Magaziner's possible perjury and criminal contempt to the United States Attorney for the District of Columbia "for further development of the facts in order to determine whether a criminal offense has been committed." *Id.* at 108. The court also set a status conference "to schedule consideration of plaintiffs' collateral requests for other sanctions and attorneys' fees and costs." *Id.* at 109.

On August 3, 1995 then United States Attorney Eric H. Holder, Jr. wrote the district court a letter stating: "The results of our investigation demonstrate that there is no basis to conclude that Mr. Magaziner committed a criminal offense in this matter. There is no significant evidence that his declaration was factually false, much less that it was willfully and intentionally so." JA 1990. On August 30, 1995, after reading a transcript of an August 11 status conference, Holder again wrote the court, to "clarify" that he did not intend to imply in the August 3 letter that he had found "a willful or deliberate attempt to mislead the Court on the part of the government." JA 2031.[2]

After additional briefing, the district court issued an order and opinion dated December 18, 1997 (as amended December 27, 1997) finding the government's conduct "sanctionable" and awarding AAPS attorney's fees and costs of $285,-864.78 both under the common law's "exception" to the "American rule" against attorney fees "where the losing party has acted in 'bad faith,' " *American Hosp. Ass'n v. Sullivan,* 938 F.2d 216, 219 (D.C.Cir.1991) (citations omitted), and under the EAJA, which provides that "a court shall award to a prevailing party other than the United States fees and oth-

2. Holder wrote specifically in response to the district court's observation at the conference that " 'the thrust' " of Holder's August 3, 1995 letter was "that 'the government and the government's lawyers have misled or misrepresented facts to the Court,' " JA 2030 (quoting district court).

er expenses ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust," 28 U.S.C. § 2412(d)(1)(A). The district court first found that Magaziner (as well as any staff and counsel who participated in drafting the Magaziner Declaration) had acted in bad faith in four respects in making the all government-employee assertion. The court further found that the government acted in bad faith by failing (1) "to correct or change" Magaziner's "factual representation to the court" that "all 'members' of the working group were federal employees" or (2) to "timely advise t[he] court that it was not making the 'all-employee' argument attributed to the government by the Court of Appeals and by plaintiffs." *AAPS v. Clinton,* 989 F.Supp. 8, 11 (1997). Having thus "separately determined that the United States in this case did not act in good faith, and that its conduct is therefore sanctionable," the district court stated that "[t]his same conduct leads the court to conclude that the positions taken by the United States in this litigation were not substantially justified." 989 F.Supp. at 13. Having found "that the defendants acted in bad faith until August 1994, when they determined to settle or moot this case," 989 F.Supp. at 15, the court awarded fees for work performed before that date in excess of the EAJA hourly cap,[3] noting: "The Court of Appeals affirmed this court on the one prior occasion where this court granted an award of attorney's fees against the government for acting in 'bad faith, vexatiously, wantonly, or for oppressive reasons,'" *id.* at 15 (citing *American Hospital Ass'n v. Sullivan,* 938 F.2d 216 (D.C.Cir.1991) (upholding fee award based on common-law exception, notwithstanding

plaintiff was ineligible for any fee under EAJA § 2412(d)(2)(B))). The government and Magaziner appeal the fee award and its underlying findings of bad faith.[4]

## II.

We review an EAJA fee award for abuse of discretion and "will reverse the district court if its decision rests on clearly erroneous factual findings or if it leaves us with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *F.J. Vollmer Co. v. Magaw,* 102 F.3d 591, 595–96 (D.C.Cir.1996). Similarly, "the question of bad faith in the context of the common law exception to the American rule on counsel fees ... is one of fact requiring a clearly erroneous standard of review." *American Hosp. Ass'n v. Sullivan,* 938 F.2d at 222. Nevertheless, the substantive standard for a finding of bad faith is "stringent" and "attorneys' fees will be awarded only when extraordinary circumstances or dominating reasons of fairness so demand." *Nepera Chem., Inc. v. Sea–Land Serv., Inc.,* 794 F.2d 688, 702 (D.C.Cir.1986). Further, the finding of bad faith must be supported by "clear and convincing evidence," *see Shepherd v. American Broadcasting Cos., Inc.,* 62 F.3d 1469, 1476–78 (D.C.Cir.1995), which "generally requires the trier of fact, in viewing each party's pile of evidence, to reach a firm conviction of the truth on the evidence about which he or she is certain." *United States v. Montague,* 40 F.3d 1251, 1255 (D.C.Cir.1994). Because we find insufficient evidence in the record to satisfy the stringent bad faith standard, we hold

**3.** When the sanctioned conduct occurred, the EAJA capped fee award rates at $75 per hour. *See* 28 U.S.C. § 2412(d)(2)(A) (1994). In 1996 the hourly cap was raised to $125. *See* Pub.L. No. 104–121, § 232(b)(1), 110 Stat. 847, 863 (1996).

**4.** AAPS disputes Magaziner's standing to appeal the findings of bad faith regarding the

Magaziner Declaration. Because those findings underlie the district court's finding of bad faith by the government, whose standing is unchallenged, we must address them in any event to resolve the government's appeal. Accordingly, we need not decide whether Magaziner himself has standing.

that the district court's bad faith findings are clearly erroneous.

■ We first conclude there is an inadequate basis for the court's finding that the government acted in bad faith by not "timely advis[ing]" the court that "it was not making the 'all-employee' argument attributed to the government by the Court of Appeals and by plaintiffs." 989 F.Supp. at 11. Assuming that the government affirmatively invoked the exemption in the district court as a defense to release of working group documents, a fact that is not at all clear from the record,[5] the government informed the court, albeit in a footnote, in its May 4, 1994 memorandum in support of summary judgment, quoted *supra* pp. 6–7, that it was not claiming the federal employee exemption for the working group. At worst the government's failure to do so earlier demonstrates only that it wanted to keep its options open— and so it remained silent. The government was under no "clear" duty before then to disavow it and therefore its silence, while apparently misleading, does not amount to bad faith. *See American Hosp. Ass'n v. Sullivan*, 938 F.2d at 222 ("[B]ad faith may be found where a party has violated a 'clear [legal] duty.'") (Ginsburg, J., dissenting, quoting majority opinion, 938 F.2d at 219).

■ We also find no bad faith in the government's failure "to correct or change" the Magaziner Declaration's representation to the court that all members of the working group were federal employees. Given that the government did not press the federal employee exemption, the representation, if false, was not material and therefore cannot be characterized as made in bad faith. *Cf. Whitney Bros.*

Co. v. Sprafkin, 60 F.3d 8, 14–15 (1st Cir.1995) (rejecting "bad faith" finding based on alleged perjury where district court "neither explained why it concluded that the [defendants] had perjured themselves nor explained why any allegedly untrue statements were material"). Further, this finding cannot stand because the district court's subsidiary findings of bad faith in drafting the Magaziner Declaration, on which the court rested the finding, are not supported by clear and convincing evidence.

■ The court first found that the Declaration "clearly implies that consultants are a category completely distinct from that of special government employees" but that Magaziner (as well as "his staff and the government's lawyers") must have known that those terms "'were used loosely and inconsistently among and between the different agencies, and not everyone agreed in their definitions.'" 989 F.Supp. at 11 (quoting 8/3/95 Holder letter at 12 (JA 2000)). The court cited no evidence, however, that at the time the Declaration was drafted Magaziner disbelieved the distinction between employees and consultants (only the former of which he characterized as working group "members") based on the degree of their participation or, alternatively, that such a distinction was objectively unreasonable. *Cf. Whitney Bros. Co.*, 60 F.3d at 14 (rejecting bad faith finding based on "frivolous" defenses because district court did not explain "how these defenses are frivolous or why they were objectively or subjectively unreasonable at the time they were advanced"). In fact, in *AAPS I*, this court concluded that the level of the consultants' involvement was a "key issue" in determining whether

---

5. The government's only explicit reference to the exemption's application to the working group was in a footnote in its March 3, 1993 memorandum opposing temporary injunctive relief. *See* JA 117 n.26 ("If plaintiffs are concerned that working group members have met with Mr. Magaziner, such meetings would not be covered by FACA. All working members, like Mr. Magaziner, are federal em-

ployees."). The Magaziner Declaration described the working group as made up exclusively of "federal government employees" but it made no mention of the FACA federal employee exemption and did not claim the employee members were "full-time, or permanent part-time" government employees, a necessary element of the exemption.

the consultants were members of the working group, although it found there was insufficient record evidence then to resolve it. 997 F.2d at 915. We therefore cannot say that the Declaration's characterization of the "consultants" as "intermittent" attendants at working group meetings, as distinct from the more frequently involved members (including special government employees), manifested bad faith. *Cf. Johnson Controls, Inc. v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of U.S. & Can.,* 39 F.3d 821, 826 (7th Cir.1994) (upholding denial of attorney's fee award because "this case presents at least a colorable question of law" and court "c[ould] not conclude, therefore, that [the plaintiff's] arguments before the district court and on appeal were frivolous or in bad faith").

■ Second, the district court found that the Magaziner Declaration was "dishonest" in representing that "people are employees when there was never a piece of paper created that said they were employees—with or without pay." 989 F.Supp. at 11. Again there is an insufficient basis for a bad faith finding. The Declaration did not claim employment paperwork had been created and there is no evidence in the record that Magaziner knew at the time of his Declaration whether it had been. He described a "special government employee" simply as one who had been "employed" by the government "for less than 130 days in a 365–day period, either with or without compensation," with no mention of employment formalities such as paperwork. As the government notes, such paperwork, while perhaps the norm, is not a condition of special government employment as statutorily defined. *See* 18 U.S.C. § 202(a) ("[T]he term 'special Government employee' shall mean an officer or employee of the executive or legislative branch of the United States Government, of any independent agency of the United States or of the District of Columbia, who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis, a part-time United States commissioner, a part-time United States magistrate . . .").

Third, the district court found that the Declaration, "in an effort to avoid discovery and block live testimony, improperly represented as a fact that all 'members' of the working group were federal employees." 989 F.Supp. at 11. As we noted above, there is no clear and convincing evidence that the Declaration's drafters did not reasonably believe the representation to be true when made.

Fourth, the district court found bad faith in that the Declaration "was actually false because of the implication of the declaration that 'membership' was a meaningful concept and that one could determine who was and was not a 'member' of the working group." 989 F.Supp. at 11. It is not clear on what basis the district court found that membership, either when the Declaration was written or through the life of the working group, was not a meaningful concept. Holder found only that membership was a "fuzzy" concept. In its discovery responses the government conceded simply that membership was not a "significant" or "operative" concept, but never that it was not meaningful (in the sense that one could not distinguish members from non-members). Although the concept of membership may not have been crystal clear, it did have meaning—indeed, the district court applied the concept in choosing the government's list of 630 members over the list of 1000 alleged members presented by AAPS. *See AAPS,* 879 F.Supp. at 105. The Declaration may have given the impression that determining membership was easy; nevertheless, because there is insufficient evidence that, in distinguishing between members and non-members, the Declaration's drafters intended to mislead the court, it was clearly erroneous for the

court to find bad faith based on the distinction.

For the preceding reasons, we hold that the district court's findings of bad faith, both in the Magaziner Declaration's drafting and in the government's litigation conduct, are without clear and convincing evidentiary support and that the attorney's fee award therefore cannot be upheld insofar as.it rests on bad faith. We further hold that the court's award cannot be sustained under the EAJA on the basis that the government's litigation position was not substantially justified because the court expressly based the award on its predicate, and inadequately supported, bad faith findings. Accordingly, we reverse the attorney's fee award and remand for further consideration by the district court. While our decision forecloses an award based on the government's alleged assertion of the federal employee exemption (whether for bad faith or under the EAJA), the district court may, if it finds the evidence so warrants, award fees under the EAJA or Fed.R.Civ.P. 11 based on another asserted defense (such as the government's argument that the working group was not a FACA committee because it "d[id] not offer advice or recommendations directly to the President," JA 120, which the record suggests may not be true, *see, e.g.,* JA 2262). In addition or in the alternative, the district court may consider assessing the sanctions (under Fed. R.Civ.P. 37) to which the court found AAPS was entitled in its November 9, 1993 order granting AAPS's motion to compel. *See AAPS,* 837 F.Supp. at 454.

*So ordered.*